Andrew C. Braun
Plaintiff in *Propria Persona*
6383 Randall Road
LeRoy, NY 14482
moojuicedad@gmail.com
(585) 993-3924



# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK
100 State St., Rochester, NY 14614

ANDREW C. BRAUN
PLAINTIFF

v.                                          CASE NO. 22cv6454-EAW

AVON CENTRAL SCHOOLS
DEFENDANT.

_____/

## COMPLAINT FOR DISCRIMINATION, RETALIATION, AND PROHIBITED ACTIONS ON THE BASIS OF DISABILITY

Andrew C. Braun ("plaintiff"), sues Avon Central Schools ("defendant") for violations of the Americans with Disabilities Act and the Americans with Disabilities Amendments Act of 2008 (hereafter "ADA" and "ADA-AA", respectively), 42 U.S.C. §12101, *et seq.*, for discrimination, retaliation, and prohibited actions taken on the basis of disability under the "regarded as" and "record of" prongs in violation of the Americans with Disabilities Act of 1990 and the Americans with Disabilities Act Amendment Act of 2008 (hereafter "ADA" and "ADA-AA", respectively), 42 U.S.C. § 12101, *et seq.* Plaintiff petitions for declaratory and injunctive relief under Title I of the ADA as implemented under 29 CFR Part 1630, *et seq.*

## PARTIES

1. Plaintiff resides in LeRoy, New York at the address of 6383 Randall Road and is a qualified individual with a disability within the meaning of the ADA and ADA-AA.

2. The defendant is an "employer" within the definition of 42 U.S.C. 12111(5), with their principal place of business at 191 Clinton Avenue, Avon, NY 14414 for all times material to the facts giving rise to the complaint.

## JURISDICTION AND VENUE

3. This court has original and exclusive jurisdiction over the plaintiff's claims pursuant to 28 U.S.C. §1331, in that the matters in controversy are brought pursuant to Title I of the ADA and ADA-AA of 2008; 42 U.S.C. §12101 and 42 U.S.C. §12112(a), (b) and (d)(4) as it pertains to "discrimination"; as implemented by 29 CFR Parts 1630.13(b) and 1630.14(b)(3), (c) and (d) as it

pertains to adverse employment actions, employers and medical examinations and interventions.

4. Venue is proper in this judicial district under 28 U.S.C. §1391 because the defendant does business in this judicial district and the acts complained of took place in this judicial district.

5. The plaintiff timely filed a charge of discrimination against the defendant with the Equal Opportunity Employment Commission (EEOC) on or about the date of January 6, 2022. The plaintiff has exhausted all administrative remedies and obtained his right to sue letter from the EEOC within the ninety days preceding the date on which he commenced his original complaint against the defendant. A true and correct copy of the EEOC's right to sue letter is alleged and included as Exhibit A.

6. The plaintiff has exhausted all administrative remedies available to him.

## BACKGROUND

7. Since 2021, the defendant adopted measures known collectively as its "Covid-19 Policy", which included requirements or accommodations that employees wear surgical masks, take experimental vaccines, practice isolation and segregation, submit to medical examinations, and disclose vital statistics as new conditions of employment.

8. The defendant admits that its "Covid-19 Policy" is intended to prevent the spread of "Covid-19", which it describes asa deadly, contagious disease. The policy rests on the assumption that every employee, the plaintiff included, has or could have this disease. That is, the policy's underlying assumption is that all of its employees are simultaneously at risk and pose a risk to the health of all other employees. No provision exists in the policy to establish through individualized assessment whether a particular employee poses any direct threat to the health of their co-workers.

9. The policy imposed mitigation measures developed by the Center for Disease Control and Prevention (CDC), largely recommended for an "over-65, immune-compromised" population. The defendant's "Covid-19 Policy" imposed these measures upon <u>all of its workers</u> without considering the individualized medical assessment of each employee's health or whether the policies were appropriate for the working population.

10. Likewise, no provisions are in place which authorize the policy measures either by legal duty or by statute, thus the defendant's adoption of this policy is <u>voluntary</u>.

11. In the rush to implement the policy no oversight was given to provide the policy with any legal enforcement mechanism. Thus the policy also relies upon the <u>voluntary</u> compliance of employees waiving their rights to informed consent, to medical privacy, to refuse experimental medical treatments and to refuse non-job-related medical inquiries or treatments.

12. One of the mitigation measures established by the defendant's "Covid-19 Policy" is a vaccination mandate. On the basis of compliance with this accommodation, the defendant's policy identified three types of employees: (1) vaccinated; (2) unvaccinated but with a medical or religious exemption; and (3) unvaccinated with no request for exemption.

13. The defendant's policy treated the third group of employees(as opposed to the other employees that complied with the "Covid-19 Policy" or exempted themselves from it) either "as if" they carried a specific, active, infectious disease, or "as if" they had an impaired or suppressed immune system that made them prone to contracting "Covid-19". The policy regarded them as disabled with a contagious disease with an impaired immune system.

14. It should also be noted that the policy fails to provide any provisions or guidance for employers to remain compliant with the ADA when they started implementing the new "Covid-19 Policy". This is a major flaw of the "Covid-19 Policy" and one which this case seeks to redress.

15. The policy has no provisions or guidance that instructs the employer on the practice of conducting an individualized assessment[1] once an employee refuses any of the accommodations offered by the policy (such as mask-wearing or experimental vaccinations).

16. The policy fails to outline the process for an employer to follow if it wants to claim an exemption to it's duties under the ADA.

17. The policy fails to provide guidance on the manner in which defendant could establish, by financial records, that it would suffer an undue financial burden for an employee's refusal, and it fails to provide guidance on how the plaintiff would document that an employee's refusal would fundamentally alter defendant's normal operations.

18. The policy fails to describe how any provision of the policy is directly related to any single employee's essential job function.

19. The policy also fails to provide guidance on how to give adequate notice to employees as to the manner in which the policy is directly related to the essential job function of any employee, including the plaintiff.

20. The policy failed to include guidance on how to process employees exceptions to the policy under the ADA. The plaintiff is not limited only to the two "accommodations" defendant refers to as a "religious exemption" or a "medical exemption".

21. The "accommodations" of religious or medical exemptions fail to meet the statutory requirements of ADA compliant accommodations as defined in 29 CFR Part 1630.2 (o) because the "exemptions" offered are not job-related adjustments to the workplace environment.

22. Any employee may refuse any accommodation under 29 CFR Part 1630.9(d) if the defendant does not have a *bona fide* exemption or exception from its legal duties under the ADA.

23. The plaintiff may refuse any or all accommodations regarding the "Covid-19 Policy" because the policy is not related to his essential job function which is the reason the job exists.

24. The policy also asked representatives of the defendant to make repeated, non-job-related medical inquiries of employees and to impose non-job-related medical treatments on them. It has no provisions for protecting the medical privacy of employees, and specifically the plaintiff's. Medical decisions are far beyond the scope of the employer-employee relationship.

25. The plaintiff took exception to the policy partly because the practices were unrelated to the performance of his essential job functions[2]. The policy, as mentioned previously, lacked enforceability, and rather than allow employees to make their own medical decisions, the defendant chose to adopt and implement its "Covid-19 Policy" through obfuscation, coercion, retaliation and interference specifically towards the "unvaccinated" employees, such as the plaintiff.

26. When the plaintiff, as a qualified individual, exercised his right under the ADA to refuse the accommodations imposed by the "Covid-19 Policy" and gave notice that the policy discriminated against him by perceiving him as having an un-assessed disability and the defendant continued to impose these unrequested accommodations.

27. The defendant also retaliated against the plaintiff by interfering with his rights, imposing punitive measures including medical examinations, constant admonishments and reprimands, denial of requests for exemptions, and threats of unpaid leaves of absence, disciplinary measures, and termination, which were directly and proximately caused by his good faith refusal to participate in the defendant's "Covid-19 Policy".

## STATEMENTS OF FACT

28. Plaintiff has been employed by Avon Central Schools since September 2002 as a physical education teacher.

29. In September 2021, defendant adopted a return-to-school protocol based on the NY Commissioner of Health's Determination on Covid-19 Testing Pursuant to 10 NYCRR 2.62 issued on September 2, 2021 which stated that employees must undergo weekly Covid-19 testing or voluntarily submit proof of vaccination for Covid-19.

30. On September 2, 2022, the school's principal and plaintiff received an email from Superintendent Ryan Pacatte admonishing the plaintiff that he had to wear his masks properly, that is, above his noses at all times.

31. On September 10, 2021, Superintendent Pacatte sent out an email stating the specifics of the New York State Determination, which included health measures such as masking-wearing, obligatory testing, or presenting "vaccination cards".

32. On September 17, 2021, defendant sent a communication asking staff members to verify vaccination status.

33. On September 20, 2021, plaintiff met with his Avon Teachers Association President, Erik Schneider to discuss the return-to-school Protocols. The ATA President stated New York State United Teacher's stance on mandatory testing was clear: teachers must show proof of vaccination or be tested weekly. Mr. Schneider stated that if plaintiff did not comply, the district might choose to put him on unpaid leave (during which he would also have to pay his own Health Insurance), and then likely file a 3020-A disciplinary procedure, after which plaintiff could be fired.

34. On September 28, 2021, plaintiff sent an email to the Superintendent asking how to request a Religious Exemption to the testing and vaccination mandates. Mr. Pacatte replied

that each request would be considered on a case-by-case basis.

35. On October 5, 2021, plainitff hand-delivered his signed Religious Exemption Request to the Superintendent's secretary and emailed him a copy.

36. On October 7, 2021, Superintendent Ryan Pacatte sent out an email in which he stated that the lack of response to the request for information about an employee's vaccination status was indication that said employee would need to be tested. This email left plaintiff feeling threatened, coerced, and intimidated. At this moment, defendant made a record of the plaintiff as "unvaccinated", and therefore regarded him as having a disability, namely, that he had (or was prone to have) a contagious disease.

37. On October 8, 2021, plaintiff asked for no further delay from Superintendent Pacatte on the response to his request for an exemption to defendant's "Covid-19 Policy". He replied that it was being reviewed by the school's attorney for further legal clarification.

38. On October 13, 2021, plaintiff met with Superintendent Pacatte and Union representative Lori Rider to discuss the religious exemption he requested. Mr. Pacatte asked plaintiff numerous personal religious and health questions. Mr. Pacatte stated that he did not believe he could grant any accommodations because it was "not in the legislation handed down from the Governor's office."

39. On October 19, 2021, plaintiff received a letter from Superintendent Pacatte stating that plaintiff's request for a Religious Exemption was not granted. Mr. Pacatte stated that plaintiff's request was not based on sincere and genuinely held religious beliefs.

40. On October 24, 2021, plaintiff informed his immediate supervisor, Robert Lupisella, principal at Avon Elementary, that he was testing under duress and that he did not give up his rights, as he was being forced to do this in order to financially support his family.

41. On Saturday November 20, 2021, plaintiff received an email from Superintendent Pacatte(**Exhibit A-#**) which stated that he had not turned in his weekly test and, if he did not comply with the requirement, he would be placed on unpaid leave effective Monday November 22, 2021. Mr. Pacatte informed plaintiff the deadline would not be extended. At the time plaintiff received said email, he was out of state, attending his eldest daughter's Basic Training Graduation from Navy Bootcamp. He felt harassed and bullied into submitting to his employer's "Covid-19 Policy", who kept bothering him even outside business hours.

42. On January 6, 2022, plaintiff filed with the EEOC a charge of Religious Discrimination against Superintendent Pacatte and the defendant.

43. On February 27, 2022, plaintiff received an email from Superintendent Pacatte that stated that New York Governor was lifting the mask mandate in public schools. Testing requirements were still going to take place for the unvaccinated employees, and therefore, plaintiff continued to feel stressed by defendant's harassing behaviors.

44. On May 18, 2022, plaintiff received an email from Superintendent Pacatte reprimanding him for not wearing a mask upon return from a positive Covid-19 test. Mr. Pacatte stated that

plaintiff's "refusal to follow clear District protocols was concerning." Once again, the burdensome pressure of Mr. Pacatte's treatment weighs heavily upon plaintiff.

45. Additionally, plaintiff has been experiencing a hostile work environment created by his employer's "Covid-19 Policy". It was a staff member from plaintiff's building that informed Mr. Pacatte of his mask-wearing which prompted the aggressive email. Also, staff who chose to get vaccinated often said that it served plaintiff right for testing positive, because he should have had his Covid-19 shot.

46. On June 7, 2022, plaintiff received an email from Stephanie Littlehale of the Buffalo office of the EEOC with an attachment from Laura M. Purcell of the Harris Beach Firm in Rochester, NY which represents the defendant. This email included the Respondent's Position Statement along with exhibit sheet A, B and C explaining the NYSDOH school covid guidance.

47. On June 18, 2022, the EEOC issued the plaintiff a Right to Sue Letter.

48. On June 23, 2022, plaintiff emailed Stephanie Littlehale of the Buffalo Local Office of the EEOC and Laura M. Purcell, the defendant's legal counsel the amended EEOC Charge of Discrimination under the ADA. Plaintiff also met with his immediate supervisor, Robert Lupisella, Principal and handed him a letter titled "Notice of Employee Discrimination and Harassment". He immediately took plaintiff's letter up to Superintendent Pacatte.

49. On July 1, 2022, plaintiff mailed the Amended Charge of Discrimination and Retaliation, Request for Mediation and Right to Sue Letter along with the EEOC Form 5 Charge of Discrimination to the EEOC Mediator, Jeremy Boyd, Stephanie Littlehale of the EEOC and Laura Purcell, defendant's legal counsel.

50. In a letter dated July 7, 2022, Superintendent Ryan Pacatte responded to plaintiff's EEOC Form 5 Charge of Discrimination, stating his grievance had been denied. He used the New York State Department of Health guidelines' language to support the testing requirement; he stated that defendant followed the State directives and was in compliance with the EEOC Guidance regarding testing requirements for employees, and said that plaintiff has not suffered any adverse employment consequences.

51. School began on September 1, 2022 with no Covid-19 rules, regulations, or protocols in place. Testing is only recommended if Covid-19 symptoms exist.

52. A true and correct copy of all written communications are attached in Exhibit A.

**COUNT I. COMPLAINT FOR DISCRIMINATION IN VIOLATION OF THE ADA AS AMENDED**

53. Plaintiff re-alleges each of the foregoing statements and those in his affidavit, and incorporates each herein and further alleges that this is a case of first impressions.

54. The defendant is a covered entity as defined under 42 U.S.C. §12111(5) of the ADA.

55. Disability cases typically involve plaintiffs who have assumed the burden of proof under the "actual" or "diagnosed" prong of the ADA; whereas, the plaintiff is proceeding under both the "regarded as" and the "record of" prongs of the ADA where the burden of proof is upon the defendant to prove that it qualified for an exemption or exception to their legal duties to comply with the ADA. These are further expressed in this complaint.

56. The plaintiff belongs to a minority of employees claiming to being regarded as having a disability by the "Covid-19Policy".

57. The plaintiff was obviously qualified for a job he was already doing, and he was willing to the job.

58. Despite the plaintiff's qualifications, the plaintiff has been denied equal access to the defendant's premises.

59. This is a case of "first impression" because the plaintiff has exercised his rights to medical privacy and informed consent to refuse the "Covid-19 Policy's" medical treatments. These rights are not limited merely to the "doctor-patient" relationship, but are squarely rooted in the ADA under 29 CFR Parts 1630.9(d), 1630.12(b), 1630.13(b), and 1630.14(c) and (d) for the reason that these rights are <u>intangible private property rights of people</u>, and of the plaintiff specifically, and are protected by law and are not originated or granted by any statute. These rights existed long before any laws were adopted by modern society and in fact, have been exercised in the formation of modern society. Plaintiff asks the question how can the "Covid-19 Policy" which is not authorized by any statute overcome established rights that form the bedrock of modern society?

60. This is also a case of "first impression" because the plaintiff, in using the ADA to protect his rights, has asked the question: how did the defendant suddenly acquire a new legal authority or legal duty to treat the plaintiff, its employee, for a disease without any medical examination or diagnosis? The answer of course is that the defendant never did acquire any such legal duty or authority.

61. This is also a case of "first impression" because, while the defendant makes the noble-sounding but disingenuous claim that their "Covid-19 Policy" is intended to prevent the spread of "Covid-19", it has absolutely no financial responsibility to engage in or administer such a policy. In fact, employers may adopt a "Covid-19 Policy" for the entirely ulterior motive of qualifying for the government's disaster relief funds.

62. This case, for the first time, requires answers for the following questions: (1) Does the defendant have proof of any financial responsibility (insurance, etc.) to compensate anyone for becoming infected with "Covid-19" after complying with their "Covid-19 Policy"?; (2) Does the defendant have proof of any financial responsibility (insurance, etc.) to compensate anyone for suffering any adverse health consequences as a result of complying with its "Covid-19 Policy"?

63. This is additionally a case of "first impression"because, if the defendant actually had the novel and *bona fide* legal right to require the plaintiff to disclose his medical records, then the defendant would have the right to simply obtain the name and address of the plaintiff's physician and request such records directly from the physician. It is well-established that no physician would make such disclosure without the express written permission of the patient (plaintiff) or without a *bona fide* court order.

64. Finally, it must be noted that an "exceptional condition" exists with this case which must be acknowledged. If the United States District Court itself has adopted the same policies as the defendant, can the court be impartial?

65. The defendant's "Covid-19 Policy" is a failed policy because it does not include several necessary provisions.

66. It has no provisions for remaining compliant with disability law or addressing the needs of employees with disabilities.

67. It has no provisions for protecting the medical privacy of employees, and specifically the plaintiff's.

68. It lacks any authorized enforcement provisions and relies either on the plaintiff to voluntarily waive his rights to medical privacy, informed consent, and rights protected under the ADA **or** upon the defendant's willingness to force submission to the policy in exchange for disaster funding.

69. The policy fails to provide any advice or instruction on how to conduct any individualized assessment[3].

70. For those employees claiming rights under the ADA, the policy fails to identify that an ADA representative of the defendant will be necessary to oversee that the policy remains in compliance.

71. In fact, the defendant's "Covid-19 Policy" completely ignores all legal duties to aid and encourage those with disabilities under the ADA.

72. The defendant's "Covid-19 Policy" is applied in a discriminatory fashion by identifying distinct groups of employees, such as those who are "vaccinated" and those who are "unvaccinated" and treating them differently.

73. The policy identifies one group of employees who claim to be exempted from the policy for medical or religious reasons but ignores the group of employees who invoke their rights under the ADA and are in a protected class.

74. The defendant presumes that it "somehow" acquired the legal duty and legal authority to cure or treat the un-assessed disability by imposing the policy measures upon the plaintiff.

75. The defendant claims that its "Covid-19 Policy" is a legitimate requirement, yet the defendant fails to act under any legal authority or legal duty to impose its policy measures on employees.  Simply claiming that a policy is "mandatory" or "required" does not automatically make it compulsory or legitimate.

76. The plaintiff is regarded as having a disability by the defendant's "Covid-19 Policy", which, according to the defendant, was intended to prevent the spread of the contagious disease known as "Covid-19".

77. Although the plaintiff is not required by law to discuss the nature of an un-assessed disability he was assumed to have, for clarity's sake he alleges that the defendant's policy rested on the assumption that every employee, the plaintiff included, had or could have this disease. That is, the policy's underlying assumption was that all of its employees were simultaneously at risk and also posed a risk to the health of all other employees.

78. It is undisputed that the defendant openly admitted that the purpose of such policy was the prevention of the spread of "Covid-19". The defendant's "Covid-19 Policy" regarded the plaintiff as having "Covid-19" or being prone to getting infected with "Covid-19". All mitigation measures flowed from this premise; but the defendant has been harassing the plaintiff specifically for not being "vaccinated" and refusing to test.

79. It is not necessary to allege that the defendant's agents personally regarded the plaintiff as having a disability, the defendant's "Covid-19 Policy" clearly demonstrates that the defendant sought to impose the policy's provisions upon the plaintiff based upon the pure speculation, stereotype and generalization that he was infected or may in the future become infected with a deadly, contagious disease (e.g. "Covid-19").

**NON-JOB RELATED MEDICAL INQUIRIES**

80. The defendant required non-job-related medical examinations of the plaintiff that were not consistent with any conceivable business necessity.

81. The defendant made disability-related inquiries of the plaintiff that were not consistent with business necessity and not permitted under 29 CFR Part 1630.13(b).

82. The defendant's "Covid-19 Policy" imposed certain non-job-related medical inquiries ("accommodations")on the plaintiff including, but not limited to: disclosing private medical records and medical history; and disclosing vital statistics, like body temperature,which are a diagnostic tool of physicians but are not a diagnosis in and of themselves.

83. The defendant's "Covid-19 Policy" imposed submitting to medical tests [4]which are a diagnostic tool of physicians but are not a diagnosis in and of themselves. This practice results in the absurd situation of relying upon a lay-man's "self-diagnosis" based upon interpreting one piece of data rather than upon a physician's professional finding.

84. The defendant also assumes that its policy was the proper treatment to mitigate the effects of "Covid-19" in the workplace. The defendant's "Covid-19 Policy" imposed certain non-job-related medical treatments including, but not limited to: taking experimental vaccines; wearing a surgical mask over the face; engaging in "social distancing" which is a euphemism for quarantine and isolation.

85. These medical treatments and medical inquiries are beyond the scope of the employee-employer relationship (contract) when they are non-job-related; in addition the defendant is trespassing on the plaintiff's medical privacy rights, both of these issues are expressed in the ADA.

86. In addition, if a vaccine prevents infection and transmission of a disease as defined by modern scientific standards, why would anyone need to take a vaccine so that someone else could avoid becoming ill? A vaccine protects the person taking it, and there is absolutely no scientific standard where any vaccine is taken to protect anyone else but the person taking it.

87. The "vaccines" demanded by the defendant are experimental because the policy was adopted during the Emergency Use Authorization (EUA) period and none of these experimental vaccines have been approved by the Food and Drug Administration, they have only been

"authorized" for emergency use which means they are in clinical trial phase. The only "vaccine" that is FDA-approved, Comirnaty, is not commercially available, should the plaintiff choose to take it.

**88.** The "Covid-19 Policy" as implemented by the defendant allowed un-skilled and unlicensed individuals to impose medical interventions upon employees because commentary on a website stated that such interventions might prevent a disease, even when these very websites disclaim such commentary as valid legal or medical advice (e.g., CDC[5], EEOC[6], etc.).

**89.** The defendant never provided notice of any kind to the plaintiff, advising the plaintiff as to the manner in which these medical treatments and medical inquiries were related to his essential job function. In fact, none of the accommodations were related to the plaintiff's essential job function because he was able to continue performing his essential employment duties without participating in the defendant's "Covid-19 Policy".

**90.** The plaintiff also alleged in his testimony and in written communications[7] that he was both willing and able to continue performing his employment duties and that the defendant's "Covid-19 Policy" was not related in any way to his essential job functions and that the defendant failed to give conspicuous notice as to the manner in which such policies were related to the plaintiff's essential job functions.

### MEDICAL PRIVACY

**91.** Furthermore, the defendant's policy violates 29 CFR §1630.14(c) of the ADA because it involves sharing non-job-related medical classifications (e.g. "vaccination status", vital statistics and "PCR"[8] testing history) without any regard to confidentiality. The policy includes no provision to preserve the medical privacy rights of any employee, including the plaintiff's.

**92.** The defendant's policy purportedly requires employees to examine themselves, and then make a self-diagnosis[9] upon which the defendant intends to rely as if such diagnosis was obtained by a licensed, qualified professional physician.

**93.** The defendant's policy does however require employees to obtain a physician's note if they are claiming some exemption to the policy for religious or medical reasons.

**94.** Ironically, the defendant's "Covid-19 Policy" also impairs the plaintiff's ability to perform his essential job functions by imposing mitigation measures which create a physical impairment that substantially limits the plaintiff's ability to engage in one or more major life activities, such as working, communicating with others, caring for oneself, breathing, etc.

**95.** The defendant refused to allow the plaintiff to continue working without first submitting to its discriminatory "Covid-19 Policy".

### MEDICAL AND RELIGIOUS EXEMPTIONS

**96.** The plaintiff is not required to request exemptions from the defendant's "Covid-19 Policy" for religious or medical reasons and in fact, is not required to request any accommodations or reasonable modifications regarding such policy because none of its provisions are related to his essential job function.

97. Therefore the plaintiff had no duty to request any reasonable modification or accommodation to the defendant's "Covid-19 Policy"; however, the plaintiff was deceptively informed that he could request a "religious or medical exemption".

98. The "accommodations" of religious or medical exemptions fail to meet the statutory requirements of ADA compliant accommodations as defined in 29 CFR Part 1630.2 (o) because the "exemptions" offered are not job-related adjustments to the workplace environment.

99. The defendant's policy did not impose any new legal duties upon the plaintiff from which he could have been exempted or needed to request exemption from.

100. In fact this deceptive practice was only intended to give the appearance of fairness while the defendant could deny or revoke exemptions as it suited the defendant. The defendant never disclosed the qualifying criteria for such an "exemption" nor disclosed the legal duty from which the plaintiff was being "exempted".

101. The plaintiff is not required to discuss the nature of an un-assessed disability he is "assumed" to have; nor is he required to request any "reasonable modifications", for an un-assessed disability he is assumed to have.

102. In actuality, the plaintiff was always protected under the ADA once he opposed the policy. He is not required to use the language of the ADA to claim this protection, however the plaintiff did specifically give notice to the defendant that he was a qualified individual who was being regarded as having a disability by the defendant's policy.

**ABSENCE OF AN INDIVIDUAL ASSESSMENT**

103. The defendant failed to conduct any individualized assessment establishing that the plaintiff's good faith refusal to participate in its "Covid-19 Policy" was a direct threat.

104. The defendant simply punished the plaintiff for his refusal on the pure speculation that the plaintiff had a disability known as "Covid-19", or on the pure speculation that someday he might have such a disease, and on the false premise that the defendant had the legal duty and authority to protect him and everyone else from contracting such a disease (disability).

105. Claiming that the plaintiff had a deadly contagious disease, or that he might someday become infected with such a disease, is not a defense to violating the ADA, specifically, 29 CFR Parts 1630.9(d), 1630.12(b), 1630.13(b) and 1630.14(b), (c) and (d).

106. The defendant cannot rely upon news or public announcements to determine that the plaintiff individually poses a direct threat because the statute requires a *bona fide* medical examination and diagnosis by a physician.

107. The "Covid-19 Policy" does not include a provision for requiring an individualized assessment by a physician to determine whether the employee poses a direct threat in the first place yet it requires employees to obtain a note from their physician in order to qualify for a "medical exemption" to the policy.

108. Is it rational to regard oneself and others as having an illness without any diagnosis, and then seek to treat everyone with the same medical intervention without any diagnosis? This behavior is defined as a mental illness in the Fifth Edition of the <u>Diagnostic and Statistical</u>

Manual for Mental Health.[10] The "Covid-19 Policy" generates such irrational behavior from those seeking to impose that they act "as if" they are suffering from an un-diagnosed mental illness.

### RECORD OF A DISABILITY

109. The plaintiff is also entitled to the protections established in the ADA under the third prong which establishes coverage when others make a "record of" of an individual's disability.

110. The defendant's "Covid-19 Policy" assumes that "unvaccinated" employees who do not have a medical or religious exemption are impaired by a contagious disease and simultaneously assume that they are impaired by a suppressed or weak immune system or respiratory system that makes them vulnerable to "Covid-19".

111. The defendant <u>made a record of the impairment its policy is intended to treat</u>, by documenting plaintiff's "vaccination status" (even though plaintiff refused to disclose his medical records) and via its communication, attitude and treatment of the plaintiff.

112. The defendant mis-classified the plaintiff and made a record of impairment by imposing its policy upon the plaintiff without any diagnosis, but based upon pure speculation, generalization and stereotype.

113. The defendant made a record of disability by classifying the plaintiff as an "unvaccinated" employee, and classifying him as needing to wear a mask and self-test which led to the defendant creating a hostile work environment; harassing him with non-job-related medical inquiries and treatments; forcing him to wear masks; harassing plaintiff with emails and admonishments regarding vaccination and masking mandates; denying plaintiff the right to be exempt from its illegal policies, and threatening plaintiff with unpaid leaves of absence, disciplinary measures, and termination, and thus causing plaintiff to suffer loss of income and employment opportunities.

114. The mitigation measures imposed by defendant's "Covid-19 Policy" also create physical impairments that substantially limit the plaintiff's ability to engage in one or more major life activities, including working, communicating and interacting with others.

115. The defendant, by its own policies, attitude toward the plaintiff, written communications, method of record-keeping and general treatment of the plaintiff, created a set of facts that satisfy the criteria under the ADA's "record of" disability prong.

### PROTECTION UNDER THE ADA

116. The defendant's "Covid-19 Policy" was not uniformly or universally applied to the plaintiff once the defendant began making a record of such disability by mis-classifying the plaintiff as having an impairment which needed to be treated or cured by the defendant's "Covid-19 Policy".

117. Upon giving the defendant notice that he was regarded as having a disability, [11]the plaintiff identified himself as being within a protected group; upon claiminghis rights to refuse the defendant's accommodations based upon his good faith opposition, he engaged in a protected activity.

118. The defendant applied the policy to everyone equally and failed to recognize that the plaintiff (1) opposed the policy, (2) gave notice of being regarded as having a disability, (3) objected to submitting to the defendant's "accommodations", and (4) was within a protected class and engaged in a protected activity.

119. The plaintiff therefore was not subject to the same "Covid-19 Policy" as everyone else who had not invoked their rights under the ADA. As an analogy: consider a defendant requiring a wheelchair-bound employee to use the stairs or face loss of income, title or employment termination because *everyone is required to use the stairs and the policy is applied equally to everyone*. It is clear that this is an erroneous conclusion that does not allow disability rights.

### ABSENCE OF AN ADA EXEMPTION FOR EMPLOYER

120. Regarding each incident of the plaintiff's good faith refusal to accept defendant's "Covid-19 Policy" measures, and the defendant's adverse response, the plaintiff was in a protected class and engaged a protected activity, and was not required to participate in the defendant's policy under 29 CFR Part 1630.9(d), unless the defendant established an exemption or exception to its legal duty to comply with the ADA.

121. The defendant failed to identify or describe any set of facts establishing that the plaintiff's good faith refusal to participate in the defendant's "Covid-19Policy" would have created any undue financial hardship.

122. The defendant failed to identify or describe any set of facts establishing that the plaintiff's good faith refusal to participate in the defendant's "Covid-19 Policy" would have fundamentally altered their normal operations. In fact, the defendant's policy itself already did in fact fundamentally alter their normal operations.

123. The defendant required non-job-related medical examinations of the plaintiff that were not consistent with any conceivable business necessity.

124. The defendant made disability-related inquiries of the plaintiff that were not consistent with business necessity and not permitted under 29 CFR Part 1630.13(b).

125. The defendant failed to establish any set of facts that proved that its regarding the plaintiff as carrying the "Covid-19 disease" was transitory or minor. If the disability is **both** transitory **and** minor, such as having the common cold, then why the need for this draconian policy and all?

126. There is no established end-date when the defendant would cease regarding the plaintiff in need of mitigation. The defendant cannot now claim that such disability is "transitory", especially since it is not acting upon any medical diagnosis, court order obtained by the Department of Health, or any individualized assessment establishing that the plaintiff individually is a direct threat.

127. To this day, the defendant has failed to demonstrate that it met or satisfied any exemptions or exceptions to its *bona fide* legal duties under the ADA to aid and encourage those with disabilities, including the plaintiff.

128. The plaintiff's allegations easily satisfy the elements of discrimination by showing that he falls within a protected group, that he is qualified for the position he held, that he was subject to

adverse employment actions and that the adverse employment actions were taken under circumstances which constitute unlawful discrimination.

**129.** The plaintiff demands a jury trial.

**WHEREFORE** plaintiff demands injunctive relief, including but not limited to: (i) a judgment from this Court that defendant's actions were unlawful; (ii) compensatory damages in whatever amount plaintiff is found to be entitled; (iii) an equal amount as liquidated damages, other monetary damages; (iv) an award of costs and reasonable court fees; and (v) punitive damages to the extent available; (vi) pre-judgment and post-judgment interest; and (vii) a jury trial on all issues so triable, and for other relief deemed appropriate by this court.

## COUNT II. COMPLAINT FOR RETALIATION IN VIOLATION OF THE ADA AS AMENDED IN 2008

**130.** The plaintiff sues the defendant for retaliation in violation of the ADA and the ADA-AA.

**131.** The plaintiff re-alleges the foregoing statements of fact and allegations from his complaint for discrimination in Count I along with his affidavit, and further alleges the following.

**132.** Upon giving defendant notice that he was regarded as having a disability and that he was a qualified individual with a disability, the defendant began retaliating against the plaintiff by imposing punitive measures and adverse employment actions, upon him for his good faith refusal to participate in the defendant's offered accommodations.

**133.** The defendant's "Covid-19 Policy" depends solely upon getting the employee to voluntarily waive his rights to medical privacy and disclose such records through coercion and retaliation, any act by an employer designed to deter an employee from claiming their rights is an adverse employment action under the ADA and is prohibited by law.

**134.** The defendant implemented a policy which regarded the plaintiff as disabled because of the plaintiff's unvaccinated status and when the plaintiff refused mitigation measures, the defendant responded with adverse employment actions.

**135.** Beginning from the moment he gave such notice to the defendant, the plaintiff suffered adverse employment actions [12] and the defendant continued attempting to impose its "Covid-19 Policy" upon the plaintiff. Defendant ignored and denied his claim of disability, reprimanded him, , for refusing its accommodations as alleged in the plaintiff's affidavit.

**136.** Title 29 of Part 1630.12(b) prohibits employers from retaliating against employees, namely the plaintiff for exercising and enjoying his rights under the ADA, specifically, "[i]t is unlawful to coerce, intimidate, threaten, harass or interfere with any individual in the exercise or enjoyment of, or because that individual aided or encouraged any other individual in the exercise of, any right granted or protected by this part."

**137.** The defendant retaliated by seeking to impose its "Covid-19 Policy" upon the plaintiff in violation of its *bona fide* legal duty of care under the ADA.

**138.** The defendant's "Covid-19 Policy" classified the plaintiff in such a way that his employment opportunities were adversely affected and limited because the defendant would not permit the plaintiff to do his job without first submitting to defendant's accommodations ("mitigation measures").

**139.** The defendant proceeded to create a hostile work environment; harass him with non-job-related medical inquiries and treatments; force him to wear masks; harass plaintiff with emails and admonishments regarding vaccination and masking mandates; deny plaintiff the right to be exempt from its illegal policies, and threaten plaintiff with unpaid leaves of absence, disciplinary measures, actions that causally resulted in the plaintiff's loss of assignment (job opportunities) and income.

**140.** The plaintiff exercised his right to refuse the defendant's Covid-19 Policy measures based upon a good faith belief that the policy did not apply to him because of the foregoing alleged

failure of the defendant to establish any exemption or exception to its legal duty to comply with the ADA.

**141.** Exercising this right is a protected activity and the defendant's "Covid-19 Policy" was not equally or universally applied to the plaintiff because he had given notice of a disability and was therefore in a protected class and engaged in a protected activity.

**142.** The plaintiff exercised his right to refuse the defendant's policy measures based upon a good faith belief that the policy did not apply to him because the policy was not related in any way to his essential job function.

**143.** The plaintiff exercised his right to refuse the defendant's policy measures based upon a good faith belief that the policy did not apply to him because the defendant failed to give plaintiff conspicuous notice as the manner in which its policy was related in any way to his essential job function.

**144.** The defendant imposed pecuniary measures and other adverse employment actions upon plaintiff which included the loss or threatened loss of pay, isolation, segregation, diminished employment responsibilities, interference with his rights as alleged in his affidavit.

**145.** Each time the plaintiff exercised his right to refuse the defendant's accommodations, he did so in good faith, and the defendant subsequently, in a manner that was causally-related to the exercise of such right, imposed adverse employment actions upon the plaintiff for no necessary reasons other than to deter him and punish him for exercising his rights.

**146.** The defendant imposed adverse employment actions upon the plaintiff which included, constant admonishments and threats of forced unpaid leaves of absence, disciplinary procedures, so that he could not perform hisessential job functions.

**147.** The defendant's "Covid-19 Policy", as alleged herein and described in more detail in the plaintiff's affidavit, describes a materially adverse change in the terms and conditions of employment, compared to the conditions of employment which existed prior to the defendant's implementation of it's "Covid-19 Policy".

**148.** These changes did not simply create an inconvenience for the plaintiff, they substantially altered the manner in which he was able to do his job and interact with co-workers by substantially impairing his ability to perform his essential employment duties.

**149.** The "Covid-19 Policy" is technically voluntary and yet the defendant imposed pecuniary measures and other adverse employment actions as a direct and proximate cause of the plaintiff's good faith refusal to participate or accept the provisions of the policy.

**150.** Each of the foregoing adverse employment actions resulted from every effort the defendant undertook to coerce the plaintiff into submitting to its "Covid-19 Policy" accommodations, and each adverse employment action described herein was causally related to plaintiff's good faith refusal to comply with the defendant's policy.

**151.** Each adverse employment action took place within moments of, or in direct response to, plaintiff's expression of his good faith refusal to comply with the defendant's policy.

152. These facts demonstrate the defendant's adverse employment actions derived from the "Covid-19 Policy" and defendant's failure to comply with the ADA.

153. This constituted a materially adverse change in the terms and conditions of employment. Before the policy, the plaintiff and other employees were protected by disability law, medical privacy rights and the right to informed consent (which as explained previously are rooted in and protected by the ADA), the right to be heard, and the right to have a complaint for harassment heard impartially by the defendant, and after the defendant's adoption of its "Covid-19Policy", all of those rights were ignored and violated in a direct and causal response to the plaintiff's exercise of his right to refuse.

154. These changes were not just "disruptive" or inconvenient; they were not merely limited to include a change in plaintiff's employment duties. These changes included (actual or likely) isolation, demotion, decrease in wages and loss of benefits and were each causally-related to each time the plaintiff chose to exercise and enjoyhis rights under the ADA.

155. The plaintiff was engaged in the protected activity of refusing in good faith to participate in its "Covid-19 Policy". The defendant was aware of plaintiff refusal from the very moment he expressed that he was regarded as having a disability and began refusing to participate in the policy.

156. Each time the defendant approached the plaintiff with a demand or request to submit to the terms of the "Covid-19 Policy", the defendant informed the plaintiff that he would be penalized, such as the plaintiff has previously alleged.

157. Each time the plaintiff exercised his right to refuse, the defendant undertook adverse employment actions against the plaintiff as previously alleged, and in each instance, such measures were causally related to the incident of refusing the policy and suffering penalties or pecuniary measures imposed by the defendant and each of these are detailed in the foregoing allegations.

158. The plaintiff demands a jury trial.

> WHEREFORE plaintiff demands injunctive relief, including but not limited to: (i) a judgment from this Court that defendant's actions were unlawful; (ii) compensatory damages in whatever amount plaintiff is found to be entitled; (iii) an equal amount as liquidated damages, other monetary damages; (iv) an award of costs and reasonable court fees; and (v) punitive damages to the extent available; (vi) pre-judgment and post-judgment interest; and (vii) a jury trial on all issues so triable, and for other relief deemed appropriate by this court.

DATED this 19 day of October, 2022.

*Andrew C. Braun*
Andrew C. Braun
Plaintiff in *propria persona*

---

[1] 29 CFR 1630.2 (r) Individualized assessment shall include determining whether an individual would pose a direct threat, the factors to be considered include: the duration of the risk; the nature and severity of the potential

harm; the likelihood that the potential harm will occur; and the imminence of the potential harm.

[2] 29 CFR 1630.2(n)(2) definition "Essential Function": "(i) ....the reason the position exists is to perform that function."

[3] 29 CFR 1630.2 (r) Individualized assessment shall include determining whether an individual would pose a direct threat, the factors to be considered include: the duration of the risk; the nature and severity of the potential harm; the likelihood that the potential harm will occur; and the imminence of the potential harm.

[4] "Covid-19 testing" results does not verify a diagnosis of being infected with "Covid-19", the test it is designed to detect the presence of a coronavirus, of which there are many, including the common cold. The tests also give many false positives when they are were not set to correct cycling according to instructions.

[5] https://www.cdc.gov/other/disclaimer.html

[6] https://www.eeoc.gov/disclaimer

[7] A true and correct copy of which is alleged as Exhibit A.

[8] Polymerase Chain Reaction

[9] "Covid-19 testing" results does not verify a diagnosis of being infected with "Covid-19", the test it is designed to detect the presence of a coronavirus, of which there are many, including the common cold. The tests also give many false positives when they are were not set to correct cycling according to instructions.

[10] Factitious Disorder or Munchhausen Syndrome by Proxy.

[11] As a current employee he is, of course, understood to be a "qualified individual".

[12] Under the ADA, adverse employment actions include any actions taken which interfere the with the plaintiff claiming their rights; which deter plaintiff from claiming their rights or which punish or retaliate against the plaintiff for claiming their rights.